IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

BETTY JONES,                        )
                                    )
      Plaintiff,                    )
                                    )
v.                                  )  No. 04-3052 Ml/P
                                    )
MEDEGEN MEDICAL PRODUCTS, LLC,      )
                                    )
      Defendant.                    )
_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

      Before the Court is the motion for summary judgment of
Defendant Medegen Medical Products, LLC ("Medegen"), filed
October 26, 2005.  Plaintiff Betty Jones ("Jones") responded in
opposition on January 16, 2006.  Medegen filed a reply on January
20, 2006.  For the reasons set forth below, Defendant's motion is
GRANTED.

**I.  Background**

      This case arises out of Plaintiff Betty Jones' allegations
that Medegen discriminated against her in the terms and
conditions of her employment because she is African-American and
Medegen subsequently retaliated against her because she filed a
complaint of discrimination.  Jones asserts that Medegen should
have paid her full salary, and not short-term disability
benefits, during her medical leave in the summer of 2003.  She
also contends that she was discriminated against because her

supervisor asked her to return to work prior to the end of her scheduled medical leave.  Finally, Jones alleges that her supervisor and/or coworkers made negative comments to her in retaliation for her filing of a charge of discrimination and the instant lawsuit.  The following facts are not in dispute:

On July 8, 2002, Jones began working as a credit specialist for Medegen, a manufacturer and marketer of plastic patient utensils and stainless steel products.  Jones was classified as an "overtime-exempt" salaried employee, which meant that she received a set salary and did not receive extra payment for any time she worked in excess of forty hours per week.  Medegen does not keep track of the sick days of overtime-exempt employees unless they miss work due to illness for more than a week.[1]  If an overtime-exempt employee misses more than five consecutive days of work due to illness, Medegen counts the first five days

---

[1]Jim Jenkins, Medegen's Vice President of Human Resources, explained the policy as follows:

> Exempt employees are exempt from the other time provisions.  So we don't track exempt employees' sick days on an ongoing basis.  If they're off a day or two here or there – they receive their full pay when they're off a day or two at a time because . . . when they work more hours than a normal 40 hours per week, they don't get paid for the extra hours.  So we don't track their sick days on an ongoing basis unless they are out for an extended period of time.

> Q.  Now, what constitutes extended?

> A.  Someone missing more than a week of work.

(Mem. Supp. Def.'s Mot. Summ. J., Ex. 4, Jenkins Dep. 37-38.)

as the employee's five annual sick days, for which the employee receives his or her full salary.  The employee subsequently receives short-term disability benefits for each additional day missed due to illness.  Pursuant to Medegen's short-term disability policy, employees receive short-term disability benefits in the amount of two-thirds of their weekly salary up to a maximum of $1,000 per week.

Medegen's short-term disability policy went into effect in January 2002.  Jones attended a 2003 benefits enrollment meeting for Medegen employees in December 2002.  At the meeting, Jones and the other employees received a packet of information about their benefits[2] as well as the 2003 benefit enrollment forms. The information included a document entitled "Summary of Benefits 2003" that described Medegen's short-term disability policy[3] and

---

[2] Copies of the informational packet Jones received at this meeting are attached to Medegen's Memorandum in Support of its Motion for Summary Judgment, as well as excerpts from Jones' deposition, taken on August 9, 2005.  The information pertained to medical and dental insurance, life insurance, short-term disability benefits, sick days, and long-term disability benefits.  (Mem. Supp. Def.'s Mot. Summ. J., Ex. 2, Jones Dep. Ex. 9.)

[3]  The policy is described as follows:

Your Short Term Disability benefit will be paid on your behalf by the Company at a rate of 66-2/3% of weekly earnings to a maximum benefit of $1,000 per week.  The elimination period for this benefit relative to injury is 0 days; sickness is 7 days. Maximum benefit period is 26 weeks.

(Jones Dep. Ex. 9 p.4.)

its "sick days" policy.[4]  Jones signed the benefit enrollment
forms on December 13, 2002.

On or about June 17, 2003, Jones underwent surgery for a
partial hysterectomy and was out of work for several weeks.
Prior to her surgery, Jones informed her supervisor, Eddie King
("King"), that she planned to go on medical leave for six weeks.
At some point during her leave, King asked Jones if she could
return to work for three days because King was going on vacation.
Jones returned to work on July 23, 2003, and July 24, 2003.  When
Jim Jenkins, Medegen's Vice President of Human Resources, learned
that Jones had returned to work without a release from her
doctor, he sent her home.  Jones returned to work on a permanent
basis on August 4, 2003.

Medegen paid Jones' full salary for the first seven calendar
days of her medical leave, pursuant to the short-term disability
policy's seven-day elimination period.  Medegen continued to pay
Jones' full salary after this period because Jones had not
submitted an application for short-term disability leave.  Jones
completed the required documentation, signed by her doctor,

---

[4] The policy is described as follows:

> In conjunction with the Company paid short term
> disability benefit described above, the Company
> provides (40) forty hours of sick pay per year plus
> (8) eight hours of personal pay that may be taken due
> to illness or injury.

(Jones Dep. Ex. 9 p.4.)

approximately two weeks after she left work.  Once her short-term disability application was approved, Medegen's insurance carrier began to pay Jones' benefits on a retroactive basis starting on June 24, 2003——the first day after the seven-day elimination period.  Jones received short-term disability benefits——the equivalent of two-thirds of her normal salary——for the remainder of the time she was out of work.

Because the insurance carrier retroactively paid Jones' benefits starting on June 24, 2003, and Medegen paid Jones' full salary through July 4, 2003, there was a period of nine days where Jones received both her full salary and disability benefits.  After Jones returned to work, Medegen sought to recover the amount it overpaid Jones.  Medegen calculated the amount of overpayment to be $906.08.

In a memorandum dated August 5, 2003, Medegen informed Jones she needed to pay back the sum of $906.08.  The memorandum explained:

> While you were off on disability pay in June,
> your salary was continued due to the fact that we
> were not aware of your disability until the day
> you were out for surgery.  Therefore you were
> overpaid $906.08.  This will have to be repaid to
> Medegen.  Below is a statement indicating the
> amount to be deducted from your payroll check for
> this overpayment.

(Mem. Supp. Def.'s Mot. Summ. J., Ex. 1, Aff. Jim Jenkins, dated Oct. 26, 2005, Ex. 2.)  The memorandum included a payment schedule and an agreement that stated:

> I agree to pay each pay period the amount of
> <u>$125.00</u> beginning on the check of August 8, 2003
> till [sic] the amount of $906.08 is paid in full.
> I will sell back three (3) days of vacation back
> [sic] to Medegen, a total of $388.32. This will
> leave a balance of $517.26 to be repaid over a
> four week period.

<u>Id.</u> (emphasis in original). Jones signed the agreement on August 5, 2003, and paid the amount in full through the scheduled paycheck deductions.

Jones filed a charge of discrimination with the Tennessee Human Rights Commission and the Equal Employment Opportunity Commission ("EEOC") on February 2, 2004. The charge alleged that Jones was required to take short-term disability leave for her medical absence whereas a similarly-situated white employee was not. Jones also alleged that she was required to return to work while still on short-term disability leave and that she was required to "repay benefits for overpayment." (Jones Dep. Ex. 15.)

On December 28, 2004, Jones filed the instant complaint alleging race discrimination under Title VII of the Civil Rights Act of 1964. Jones's first claim is that she should have received her full salary rather than short-term disability benefits during the period she was out of work for her surgery. Accordingly, she should not have been required to repay any money to Medegen. Jones next claims that Medegen discriminated against her when her supervisor demanded that she return to work before

Jones received a medical release from her doctor.  On December 30, 2004, Jones amended her complaint to include a claim of retaliation under Title VII.  Jones alleges that since she filed her charge of discrimination with the EEOC, she has been harassed by her supervisor and coworkers at Medegen.

## II.  Applicable Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989).  In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When confronted with a properly-supported motion for summary

-7-

judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir. 1998).  A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

**III.  Analysis**

Medegen moves for summary judgment on all of Jones' claims. Medegen contends that summary judgment is proper on Jones' first claim——that she should have received full pay during her period of medical leave——because Jones cannot make out a prima facie case of race discrimination and cannot demonstrate that Medegen's legitimate, nondiscriminatory reason for its actions is pretextual.  Medegen contends that summary judgment is warranted on Jones' second claim——that she was required to return to work prior to receiving medical clearance——because this event does not constitute an adverse employment action and because Jones has failed to set forth facts that indicate that Medegen in fact required her to return to work.  Finally, Medegen seeks summary

judgment on Jones' retaliation claim because none of the alleged incidents of retaliation constitute adverse employment actions and because there is no evidence of causation.  The Court will address Medegen's arguments in turn.

**A.  Discrimination Claims**

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §§ 2000e-2(a)(1).  Jones may establish a prima facie case of race discrimination under Title VII through direct evidence or through circumstantial evidence under the McDonnell Douglas burden-shifting paradigm.  Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).  As Jones has not put forward any direct evidence that she was discriminated against on the basis of her race, the Court will apply the McDonnell Douglas framework.

Under this analysis, a plaintiff must first make out a prima facie case of discrimination by showing that: (1) she is a member of a protected group; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) similarly-situated non-protected employees were treated more favorably.  Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995); see also McDonnell Douglas Corp. v. Green,

-9-

411 U.S. 792, 803 (1973).  Once a plaintiff establishes a <u>prima</u>
<u>facie</u> case, the burden shifts to the defendant to articulate a
legitimate, nondiscriminatory reason for its actions.  <u>Texas</u>
<u>Dep't of Cmty Affairs v. Burdine</u>, 240 U.S. 248, 254-56 (1981);
<u>Talley</u>, 61 F.3d at 1246.  If the defendant offers a legitimate,
nondiscriminatory reason for its actions, the burden shifts back
to the plaintiff to show that the proffered reason is a pretext
for discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 804-05.  The
ultimate burden of persuasion always remains with the plaintiff.
<u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993).

### 1. Failure to Receive Full Pay for Medical Leave

Medegen makes two arguments in support of summary judgment
on Jones' claim that she should have received full pay during her
period of medical leave rather than short-term disability
benefits.  Medegen first contends that Jones has not established
a <u>prima</u> <u>facie</u> case of discrimination under Title VII because she
cannot show that she was treated differently than similarly-
situated non-minority employees.  Second, Medegen argues that
Jones cannot demonstrate that Medegen's legitimate,
nondiscriminatory reason for its actions is a pretext for
discrimination.

Jones alleges that she was treated differently than
similarly-situated white employees because she was required to
take short-term disability leave whereas white overtime-exempt

employees received their full weekly salaries whenever they had to leave work due to illness.  As the Sixth Circuit has explained, a plaintiff alleging disparate treatment discrimination must "produce sufficient affirmative evidence to establish that the non-minority employees with whom she compares her treatment were 'similarly situated in all respects'" in order to survive summary judgment.  Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992).  To be deemed "similarly-situated," the "individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Id. at 583.

Jones contends that another overtime-exempt Medegen employee, Peggy Wiley ("Wiley"), who is Caucasian, was paid her full salary when she was out of work for medical reasons.  Jones offers the declaration of Annetta Cross ("Cross"), a former Personnel Assistant at Medegen, in support of this claim.  Cross' declaration, however, merely states that sometime in 2002, Wiley "was off for either shoulder or back surgery" and that Wiley "was paid her full salary for whatever time she was out for this surgery in 2002, but I do not know whether she was off work for more than a week."  (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 8(a),

Cross Decl. 1-2.)[5]

This statement is insufficient to establish that Wiley and Jones were "similarly situated in all respects." Cross's declaration does not set forth the basis for her personal knowledge of Wiley's surgery or the circumstances surrounding it. Her vague and speculative assertions fail to show that Wiley and Jones held comparable positions, took comparable lengths of medical leave, or were otherwise similar. As such, this information does not constitute "affirmative evidence" necessary to establish the similarly-situated element of Jones' <u>prima facie</u> case.

Moreover, Jones does not dispute Medegen's evidence that since 2002, there has been only one overtime-exempt employee other than Jones who has been out of work for medical reasons for more than five days. (Def.'s Mem. Supp. Mot. Summ. J., Ex. 1, Jenkins Aff., Ex. 1.) This employee, Jim Bennett ("Bennett"), was Medegen's Vice President of Manufacturing and was responsible for Medegen's entire Colorado operation. In February of 2003, Bennett went into a coma that lasted for ten weeks. Medegen believed that Bennett had little chance of survival and, if he did recover, that he would not be able to return to work. According to Jim Jenkins, Medegen's Vice President of Human

---

[5] Cross also states that because she and Wiley worked in different areas of the office, she "would not have been able to know which days [Wiley] was at work or was not at work, and therefore would not know how long she was out for any particular absence." (<u>Id.</u> at 2.)

Resources, Medegen decided that due to Bennett's "life threatening medical situation, the trauma his family was experiencing[,] . . . and Bennett's position as a high level Medegen executive, . . . that there was no way the Company could or would add to his family's distress by cutting their income during this time of crisis." (<u>Id.</u> ¶ 17.)  Medegen therefore made up the difference between the amount of Bennett's short-term disability benefits($1000 per week, the maximum allowed under the policy) and his weekly salary ($1,925.79).  (<u>Id.</u>)  Jenkins expressly denies that this decision had anything to do with the fact that Bennett was white.  (<u>Id.</u> ¶ 19.)

The Court agrees with Medegen that Bennett and Jones are not similarly-situated employees for the purposes of Title VII analysis.  Bennett was a high-level executive, whereas Jones held a non-management position as a credit specialist.  Moreover, Bennett's life-threatening coma and prolonged absence from work constitute "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Mitchell</u>, 964 F.2d at 583.

Because Jones has not established that she was treated differently than similarly-situated non-minority employees, she has failed to make out a <u>prima</u> <u>facie</u> case of discriminatory treatment on her first claim.  Accordingly, there is no need for the Court to address Medegen's argument that it has asserted a legitimate, nondiscriminatory reason for its actions.  Medegen's

motion for summary judgment on this claim is GRANTED.

**2. Early Return to Work**

Jones' second claim of discrimination is that her supervisor, Eddie King, called Jones after her surgery but before she had been medically cleared to return to work and demanded that she work from July 23-24, 2003——a little over five weeks after her surgery——because King was going on vacation.  (Am. Compl. ¶ 12.)  Medegen disputes that King demanded that Jones return to work, and argues that Jones' voluntary decision to assist King by coming back to work earlier than planned does not constitute an actionable "adverse employment action" under Title VII.

As set forth above, Jones must establish that she suffered an adverse employment action in order to make out a prima facie case of discrimination.  Medegen argues first that Jones was not subjected to an adverse employment action because it was entirely her decision whether to return to work earlier than planned. Medegen notes that when Jones was asked during her deposition specifically whether King "demanded" that she return to work, Jones said that he did not.  (Jones Dep. 156.)  Jones testified that she felt that she had to return early because "by my being a new hire at the company, I felt that if I didn't come back I believe[d] my job was in jeopardy" (Id. at 155.)  Medegen points out that Jones had worked for the company since July 2002, and

-14-

therefore she was not a "new hire."

Medegen also argues that even if Jones had been forced to return to work earlier than scheduled, this does not constitute an adverse employment action under Title VII.  An adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct."  <u>Kocis v. Multi-Care Mgmt., Inc.</u>, 97 F.3d 876, 885 (6th Cir. 1996).  As the Sixth Circuit has explained, factors to consider in determining whether an employment action is materially adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  <u>Id.</u> at 886.  A "mere inconvenience or an alteration of job responsibilities" or "a bruised ego" does not constitute an adverse employment action.  <u>White v. Burlington Northern & Santa Fe Ry. Co.</u>, 364 F.3d 789, 797 (6th Cir. 2004)(en banc).

Jones has not set forth any facts to show that her two-day return to work while her supervisor was on vacation constitutes an adverse employment action under existing Sixth Circuit precedent.  Even if Jones felt as though she had to come back to work because she feared losing her job, she has failed to show that her return was anything other than a "mere inconvenience."  Jones has thus failed to establish a <u>prima facie</u> case of

-15-

discrimination, and Medegen's motion for summary judgment on this claim is GRANTED.

**B.  Retaliation Claim**

Finally, Jones alleges that after she filed a charge of discrimination with the EEOC in February 2004, there were two instances in which she was retaliated against.  She also alleges one instance of retaliation after she filed the instant lawsuit in December 2004.

The first incident occurred sometime in October or November of 2004.  According to the Amended Complaint, Jones "was cursed at by a coworker when the coworker learned that she (coworker) was to reassume her work duties from the plaintiff.  No action was taken against the coworker, because it was felt by management that the language was not directed at the plaintiff, but the situation."  (Am. Compl. ¶ 27.)  Jones testified about this incident at her deposition.  She stated that the coworker, Kay Welch ("Welch"), was very hostile towards Jones when Welch learned that she had been assigned a particular task that Jones had previously handled.  Welch asked Jones, "Do you want me to start doing these damn RAs[6] now?"  (Jones Dep. 237-38.)  Jones testified that after Welch made the negative comment, she apologized to Jones several times and explained that she was angry with their supervisor and was not angry with Jones.  (<u>Id.</u>)

_____

[6] "RAs" stands for "return authorizations," which is paperwork that must be completed when products are returned.  (<u>Id.</u> at 239.)

The second incident involved an exchange between Jones and
King in November 2004.  Upon learning that Medegen was going to
be testing the building's sprinkler system, Jones, noting that
there was a sprinkler over her desk, told a coworker, "Oh, that
means if the sprinkler system comes on, we get to go home."
(Jones Dep. 234.)  King, who had heard Jones make the comment,
told her, "If you want to, you can go home permanently."  (<u>Id.</u>)
Jones and King subsequently exchanged several e-mails about the
comments.  King explained:

> It is just a pet peeve of mine to hear someone
> make a comment whether in jest or for real like
> you did about the sprinklers and going home.  I
> hate to see people unhappy at their job. . . . I
> am not saying you are unhappy here and I certainly
> did not mean what I said.  You do a great job
> here.  I am very satisfied with your work.  But I
> guess I was irritated by what you said.  Both our
> comments were uncalled for.  I am sorry for my
> comments.

(Jones Dep. Ex. 17.)  Jones and King exchanged additional e-mails
in which Jones explained that she did not mean the remark in a
negative sense and King repeated his apologies.  (<u>Id.</u>)

The final incident that Jones alleges as part of her
retaliation claim occurred after she filed the instant lawsuit.
Jones testified in her deposition that one evening at work in
January 2005, she ran into a coworker in the hallway.  This
coworker was "having [a] little tantrum, and so her finger was
pointing in [Jones'] face telling [Jones] that [Jones] can tell
anybody that [the coworker] was quitting and all that stuff."

(Jones Dep. 243.)   The following day, King came to Jones' desk
and said, "Betty, Dan O'Neal[7] said it would be best if you not
[sic] said anything about what happened Friday night because
human resources is going to take care of it."   (Id.)   Jones
testified that she felt as though a "gag order" had been placed
on her not to say anything about what she had observed.   (Id.)

　　　To establish a prima facie case of retaliation under Title
VII, a plaintiff must show: "(1) that she engaged in protected
activity; (2) that defendant knew of this exercise of her
protected rights; (3) that defendant consequently took an
employment action adverse to plaintiff; and (4) that there was a
causal connection between the protected activity and adverse
employment action."   Balmer v. HCA, Inc., 423 F.3d 606, 613-14
(6th Cir. 2005).   If the plaintiff makes out a prima facie case,
the defendant may rebut the presumption of retaliation with a
legitimate, non-discriminatory reason for its actions.   Id. at
614.   The plaintiff must then show that the employer's proffered
reason for the action taken is pretextual by putting forward
"sufficient evidence from which the jury could 'reasonably reject
[the defendant's] explanation' and infer that the defendant[]
'intentionally discriminated' against her."   Id.

　　　Medegen argues that it is entitled to summary judgment on
Jones' retaliation claim because Jones has failed to establish a

_____

[7] Jones does not explain who Dan O'Neal is.

prima facie case of retaliation.  The Court agrees.  Jones has
failed to put forward any evidence to suggest that the comments
made by her coworker or supervisor constitute "adverse employment
actions."  As explained above, an adverse employment action for
purposes of Title VII is a "materially adverse change in the
terms or conditions of . . . employment because of [the]
employer's conduct."  Kocis, 97 F.3d at 885.  The comments that
Jones cites, while perhaps insensitive, do not qualify as adverse
employment actions because they did not result in any materially
adverse change in the terms or conditions of Jones' employment.
Jones has not alleged, much less demonstrated, that she suffered
a loss of pay, rank, benefits, or, in fact, any change in the
terms or conditions of her employment as a result of these
comments.  As the Supreme Court has made clear, "simple teasing,
offhand comments and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the terms
and conditions of employment." Faragher v. City of Boca Raton,
524 U.S. 775, 788 (1998)(internal citation omitted). Accordingly,
Jones has failed to establish this element of her prima facie
case of retaliation.

    Moreover, Jones has failed to show a causal connection
between her protected activity and the alleged incidents of
harassment. "[T]o establish the element of causal link a
plaintiff is required to proffer evidence sufficient to raise the
inference that her protected activity was the likely reason for

-19-

the adverse action." <u>EEOC v. Avery Dennison Corp.</u>, 104 F.3d 858, 861 (6th Cir. 1997)(internal quotation omitted).  "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge [of the protected activity] coupled with a closeness in time that creates an inference of causation. . . . However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 566 (6th Cir. 2000)(quotation omitted).

Jones testified that she believes that King's comments were casually connected to the filing of her EEOC charge and complaint because King had never said anything similar to her in the three years that she had been working for him.  Jones also claims that Kay Welch, the coworker who asked Jones, "Do you want me to start doing these damn RAs now?" had never "cursed" at her before. Jones admits that she has no tangible information indicating a causal connection; she merely assumed King knew about her charge and "that's why he said what he said."  (Jones Dep. 288.)[8] Jones' assumptions are plainly insufficient to establish the requisite causal connection between her protected activity and the comments about which she complains.

In sum, Jones has failed show that she suffered an adverse employment action or a causal connection between her protected

---

[8]Jones further testified that she does not know if <u>anyone</u> at Medegen was aware that she filed a charge with the EEOC.

activity and the comments of her supervisor and coworkers.   Jones has thus failed to establish a <u>prima</u> <u>facie</u> case of retaliation. Medegen's motion for summary judgment on this claim is GRANTED.

**IV.  Conclusion**

For the reasons set forth above, Medegen's motion for summary judgment on all of Jones' claims is GRANTED.


SO ORDERED this 14th day of April, 2006.


                              /s/ Jon P. McCalla
                             JON P. McCALLA
                             UNITED STATES DISTRICT JUDGE